# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

## AT NASHVILLE

### APRIL SESSION, 1999

FILED

June 2, 1999

Cecil W. Crowson
Appellate Court Clerk

| | | |
|---|---|---|
| **STATE OF TENNESSEE,** | **)** | **C.C.A. NO. 01C01-9806-CC-00266** |
| | **)** | |
| Appellee, | **)** | |
| | **)** | |
| | **)** | **WILLIAMSON COUNTY** |
| **VS.** | **)** | |
| | **)** | **HON. TIMOTHY EASTER** |
| **PERRY SALEEM LEE,** | **)** | **JUDGE** |
| | **)** | |
| Appellant. | **)** | (Aggravated Assault) |

## ON APPEAL FROM THE JUDGMENT OF THE
## CIRCUIT COURT OF WILLIAMSON COUNTY

FOR THE APPELLANT:

PERRY SALEEM LEE
Pro Se
SCCF/CCA
P.O. Box 279
Clifton, TN 38425

FOR THE APPELLEE:

PAUL G. SUMMERS
Attorney General and Reporter

KIM R. HELPER
Assistant Attorney General
425 Fifth Avenue North
Nashville, TN 37243-0493

JOSEPH BAUGH
District Attorney General
P.O. Box 937
Franklin, TN 37065-0937

OPINION FILED _____

AFFIRMED

DAVID H. WELLES, JUDGE

# **OPINION**

The Defendant, Perry Saleem Lee, was indicted on two counts of aggravated assault. Following a jury trial in April 1998, he was found guilty of one count of simple assault against victim Charles Steele and one count of aggravated assault against victim Kenneth Lockridge. The Defendant now appeals his convictions pro se, pursuant to Rule 3 of the Tennessee Rules of Appellate Procedure.

The Defendant presents eight issues on appeal: (1) whether the evidence presented at trial was sufficient to support his convictions; (2) whether the trial court erred by denying his motion for a new trial; (3) whether the victims' in-court identifications of him violated his right to a fair trial; (4) whether the trial court erred by proceeding with the trial despite the Defendant's reservations about his trial counsel's familiarity with the case; (5) whether he received ineffective assistance of counsel; (6) whether the prosecutor made improper statements during closing arguments; (7) whether the reasonable doubt instruction was infirm; and (8) whether he was improperly denied records from his trial to perfect his appeal.[1]

All events underlying the Defendant's present convictions occurred in the early morning hours of August 29, 1997. Aside from officers involved in the Defendant's arrest, the only witnesses to testify at trial were the two victims and the Defendant. The Defendant and the victims differed in their versions of what transpired on the night of the crimes.

---

[1] We address the issues in a different order than that presented in the Defendant's brief.

Charles Steele, the first victim, testified that he had known the Defendant since childhood. He stated that on August 29, 1997, around two or three o'clock a.m., he was "just hanging out . . . sipping a few beers" on Natchez Street. He reported that at the time, he was standing with a group of people in front of the house next to the Defendant's home; part of the group had moved into the driveway between the two houses. Steele testified that while he was standing on the sidewalk, the Defendant emerged from his home, asked everyone to leave the premises, and then said, "Carry your ass back to Hard Bargain" or "Carry that s__t on back to Hard Bargain." Steele assumed that the Defendant was addressing him because he was the only member of the group who lived at Hard Bargain. Steele testified, "Seemed like I told him . . . there wasn't no sense in all this or I was going, I was leaving, or something to that effect . . . ." According to Steele, while they were talking, the Defendant pulled a machete or a knife, which Steele described as two and a half feet to three feet long and three to four inches wide, from either the leg of his pants or a scabbard at his side and began to swing it. Steele testified that he backed away from the Defendant for about thirty feet while the Defendant swung the knife at him, then stumbled and fell. Steele maintained that while on the ground, he raised his hand up in self-defense as the Defendant continued swinging the knife, and the knife cut his hand. Steele recalled that after he was cut, it "seemed like [the Defendant] swung at me again, and I heard the blade hit the ground, and I jumped up and ran . . . toward my car."

Steele testified that he drove himself to the emergency room of a nearby hospital, stopping along the way at a gas station to get a towel to clean his bloody hand. He stated that while at the hospital, he identified the Defendant as his attacker to police. He further testified that he required several stitches between

-3-

his first finger and thumb and that his middle finger was cut to the bone, requiring surgery. He stated that he now has limited use of his middle finger.

On cross-examination, Steele admitted to having been previously charged with the sale of cocaine. He also reported that he may have smoked crack cocaine on the evening of August 28, 1997, during the time immediately prior to his confrontation with the Defendant. However, he denied smoking crack cocaine at or near the Defendant's residence that night. He also denied having any drug paraphernalia in his hand at the time of his confrontation with the Defendant, and he testified that he did not notice anyone else on Natchez Street engaging in drug use at that time. Furthermore, he admitted that after this incident, he told an acquaintance, Vicky Howell,[2] that he had cut his hand cleaning a turtle, but he explained that he had lied to Howell because he did not believe it was her business to know how he had been injured.

Kenneth Lockridge, the second victim, encountered the Defendant, whom he had known "all his life" and whom he helped raise, shortly after Steele departed for the hospital. Lockridge testified that he and his girlfriend were walking down Natchez Street in the early morning hours of August 29, 1997 when he saw the Defendant across the street. Lockridge testified that he said to the Defendant, "What's up, my nigger?" which he "considered . . . being friendly." He testified that the Defendant responded, "Hey, fat m____r-f____r, you got your [police] wire on?"[3] According to Lockridge, the Defendant then crossed the street

_____

[2] Because there is no written transcript of the trial, but rather a videotape record, the spelling of Vicky Howell's name may be incorrect.

[3] Lockridge denied ever wearing any type of police wire.

-4-

and hit him. Lockridge stated that he said, "Man, go on" and "tried to walk away." However, as Lockridge continued walking, the Defendant followed him, hitting him numerous times about the face and head until Lockridge fell down, hoping that the attack would cease. Lockridge testified that while he was on the ground, the Defendant "put [the gun] upside [his] head," and he feared that the Defendant might fire the gun. He recalled that at this point, the Defendant's girlfriend pleaded for the Defendant to stop, and the Defendant ended the attack. Lockridge then went to the hospital, where he identified the Defendant as his attacker. An officer who saw Lockridge at the hospital stated that his nose was swollen, his mouth was bleeding, and that there was blood on his clothes.

The Defendant presented a different account of the events underlying his convictions. He testified that he arrived home around midnight on August 28, 1997 and found a number of people standing in front of his house and in the driveway next to his home. This disturbed him, he testified, because of the high incidence of drug use at night on his street. He claimed to have previously put up "No Loitering," "No Trespassing," and "No Parking" signs on his property in an attempt to protect his children from the drug users in the neighborhood.

The Defendant testified that on August 28, he parked his car and went inside for a while before going back outside to the sidewalk to confront the group of people standing in front of his home. He recounted that he approached the group and asked them to leave, and some of them began to depart. He stated that Charles Steele, however, whom he claimed held a "straightshooter," drug paraphernalia used for smoking crack cocaine, did not move but instead started to light the straightshooter. According to the Defendant, he started toward

Steele, again asking him to leave, and Steele fell down. He then turned back toward his house, and when he looked back, Steele was gone. The Defendant denied carrying any type of weapon during this confrontation and stated that he did not even own a knife matching that described by Steele.

The Defendant testified that he went back inside his house, told his girlfriend what had happened, and warned her that he was going back onto the porch. He stated that he had once been threatened with a "drive-by" shooting by some teenagers, and he feared that the people who had been standing outside of his house that evening might return. While on the porch, he saw Lockridge walking down the street. He stated that while walking toward the Defendant's home, Lockridge asked him, "Where's it at?" He stated that he interpreted this to mean that Lockridge was looking for drugs. The Defendant reported that when he told Lockridge to "[g]o on," Lockridge reached into the bib of his overalls as he continued to walk toward the Defendant. The Defendant then hit Lockridge, and he stated that Lockridge "might have swung back." The Defendant testified, "I put a left-right on him. Then I hit him with a left. Then I put another left on him. Then he fell, and I kicked him in the face." He described the incident as "a fight" and claimed that Lockridge would not admit it was a mutual confrontation only "because he got whooped." He claimed that he was unarmed during the altercation and that he feared Lockridge might be armed, saying "Late at night ain't no telling what a junkie got." He also admitted that although he had put up signs on his property, he never reported to police any of the drug-related incidents in his neighborhood. He explained that he could not do so because he did not have a phone.

-6-

Both Steele and Lockridge were treated for their injuries at the Williamson County Medical Center. According to the testimony of police officers who investigated this incident, Steele and Lockridge each reported essentially the same version of events at the hospital on August 29 as they later presented in court. Based on information provided by the two victims at the hospital, Officer David Neal[4] went to the Defendant's home to investigate. Neal testified that when he arrived, the Defendant refused to communicate his name or date of birth. Neal therefore transported the Defendant to the hospital, where Lockridge identified him. Neal testified that while he was inside the Defendant's home, he did not notice any weapons. In addition, no weapons were found during a subsequent search of the Defendant's home and vehicle.

## I. SUFFICIENCY OF THE EVIDENCE

The Defendant first contends that the evidence presented at trial is insufficient to support the jury's findings of guilt. He argues that it "should be abundantly clear that had the Defendant intented [sic] to cause serious bodily injury to either of the victims, it would appear that he was surely coupled with the ability to do so, if such had been his intent. Yet the State's case in chief, clearly shows that the Defendant was the person whom [sic] received serious injuries, as a result of the alleged criminal episode." He argues that there was no corroboration of the victims' claims of injury and maintains that "the State should have put forth evidence of the injuries received" beyond testimony offered by the victims. He also points out the fact that no weapons were found in his possession. Furthermore, he claims that the only evidence "tending to connect

---

[4] The spelling of Officer Neal's name has been approximated.

the Defendant to this crime is that it was alleged to had [sic] occurred in front of the Defendant's home."

Tennessee Rule of Appellate Procedure 13(e) prescribes that "[f]indings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt." Tenn. R. App. P. 13(e). In addition, because conviction by a trier of fact destroys the presumption of innocence and imposes a presumption of guilt, a convicted criminal defendant bears the burden of showing that the evidence was insufficient. McBee v. State, 372 S.W.2d 173, 176 (Tenn. 1963); see also State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992) (citing State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1976), and State v. Brown, 551 S.W.2d 329, 331 (Tenn. 1977)); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982); Holt v. State, 357 S.W.2d 57, 61 (Tenn. 1962).

In its review of the evidence, an appellate court must afford the State "the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences that may be drawn therefrom." Tuggle, 639 S.W.2d at 914 (citing State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978)). The court may not "re-weigh or re-evaluate the evidence" in the record below. Evans, 838 S.W.2d at 191 (citing Cabbage, 571 S.W.2d at 836). Likewise, should the reviewing court find particular conflicts in the trial testimony, the court must resolve them in favor of the jury verdict or trial court judgment. Tuggle, 639 S.W.2d at 914.

We find that the evidence presented at trial is sufficient to sustain the Defendant's convictions. The two victims in this case testified that they had each

been involved in a confrontation with the Defendant during which the Defendant wielded a weapon. Each claimed that the Defendant's aggression was essentially unprovoked and unreciprocated. Moreover, each victim claimed to have been injured by the Defendant, and both were treated for their injuries at the hospital. Testimony by the Defendant to the contrary presents a classic question of fact for consideration by the jury. Upon review of the testimony presented at trial, the jury evidently credited the victims' accounts of their confrontations with the Defendant. We will not disturb this conclusion on appeal. Instead, we resolve the conflicts in trial testimony in favor of the jury verdict, see id., and conclude that there was sufficient evidence presented at trial to support the verdict.

## II. MOTION FOR NEW TRIAL

The Defendant next argues that the trial court erred by denying his motion for new trial. The State responds that because the motion was premature, it is a nullity and therefore must be denied. The Defendant also alleges that the trial judge told him that "the law does not apply in his court room [sic]." Apparently, he argues that the trial judge maliciously denied his motion for new trial "to prevent the Defendant from establishing a showing of Judicial Misconduct."

The jury announced the verdict in this case on April 3, 1998, and the Defendant filed his motion for new trial on April 21, 1998. The sentencing order was later filed on May 29, 1998. The trial court denied the motion as premature but informed the Defendant that the proper time for filing the motion was within thirty days of sentencing. In his brief, the Defendant claims to have filed a

-9-

second motion for new trial "on or around" May 28, 1998, but the record does not contain a copy of a second motion.

Rule 33(b) of the Rules of Criminal Procedure controls the time for filing a motion for new trial. Rule 33(b) states, in pertinent part, "A motion for a new trial shall be made in writing, or if made orally in open court shall be reduced to writing, within thirty days of the date the order of sentence is entered." Id.[5] We believe that one of the reasons for this rule is that a defendant should not be required to decide whether to pursue a new trial until such time as the disposition of the case is known. Only after the sentence is imposed may the Defendant fully evaluate whether it would be appropriate or beneficial to seek a new trial.

Here, the Defendant did not file his motion within the technical limits of Rule 33(b). However, we find no prejudice to the State from the premature filing of the motion, nor any reason to conclude that the issues raised in the motion for new trial should not be considered on appeal. We will therefore address the issue raised in the Defendant's motion for new trial which he now argues on appeal.

We have thoroughly reviewed the record in this trial and find absolutely no evidence supporting any of the Defendant's allegations of judicial misconduct. We are unable to find any comment made by the trial judge that "the law does not apply in his court room [sic]," either during an in-chamber discussion, when the

---

[5] In arguing that his motion for new trial was improperly denied, the Defendant cites an older version of the rule, which states that the motion should be filed within thirty days of the verdict. The rule was amended in 1985 to conform to Tennessee Code Annotated § 40-35-401. Tenn. R. Crim. P. 33(b) advisory commission comments.

Defendant alleges the comment was made, or during the trial itself. We conclude that the Defendant's accusations of judicial misconduct are entirely without merit.

## III. IN-COURT IDENTIFICATIONS

The Defendant argues that the in-court identifications made of him by the victims were tainted because of suggestive pretrial identification procedures, including the failure of police to conduct a pretrial lineup. The Defendant has failed to include this issue in his motion for new trial. Therefore, this issue has been waived. Tenn. R. App. P. 3(e); see State v. Clinton, 754 S.W.2d 100, 103 (Tenn. Crim. App. 1988).

## IV. SUBSTITUTION OF COUNSEL

The Defendant next argues that the trial court erred in proceeding to trial despite his reservations about his counsel's familiarity with his case, and he complains that his counsel failed to file two pretrial motions which he requested. The Defendant failed to include this issue in his motion for new trial. Therefore, this issue has been waived. Tenn. R. App. P. 3(e); see State v. Clinton, 754 S.W.2d 100, 103 (Tenn. Crim. App. 1988).

## V. INEFFECTIVE ASSISTANCE OF COUNSEL

The sole issue raised by the Defendant in his motion for new trial which he also argues on appeal concerns ineffective assistance of counsel. He contends that his representation at trial was deficient, citing a plethora of alleged errors by his trial counsel, David King, which includes Mr. King's: (1) failure to properly investigate the case, including the "validity of the identification procedures used to identify the Defendant" and "the testimony by Ms. Howell"; (2) failure to request

a continuance for further preparation because of his late involvement in the case; (3) failure to spend any time with the Defendant in preparation for the case; (4) failure to object to an alleged improper statement made by the trial judge or to move the court for a change of venue following the alleged statement; (5) failure to adequately cross-examine the State's witnesses; (6) failure to bring "to the attention of the jurors" the victims' prior criminal records; and (7) failure to reveal to the jury that the Defendant received a "severe wound" to his hand which he maintains was caused by the victims.

In determining whether counsel provided effective assistance at trial, the court must decide whether counsel's performance was "within the range of competence demanded of attorneys in criminal cases." Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). To succeed on a claim that his counsel was ineffective at trial, a petitioner bears the burden of showing that his counsel made errors so serious that the attorney was not functioning as counsel as guaranteed under the Sixth Amendment and that the deficient representation prejudiced the petitioner, resulting in a failure to produce a reliable result. Strickland v. Washington, 466 U.S. 668, 687 (1984); Cooper v. State, 849 S.W.2d 744, 747 (Tenn. 1993); Butler v. State, 789 S.W.2d 898, 899 (Tenn. 1990). To satisfy the second prong, the petitioner must show a reasonable probability that, but for counsel's unreasonable error, the fact finder would have had reasonable doubt regarding petitioner's guilt. Strickland, 466 U.S. at 695. This reasonable probability must be "sufficient to undermine confidence in the outcome." Harris v. State, 875 S.W.2d 662, 665 (Tenn. 1994) (citing Strickland, 466 U.S. at 694).

When reviewing trial counsel's actions, this Court should not use the benefit of hindsight to second-guess trial strategy and criticize counsel's tactics. Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982). Counsel's alleged errors should be judged at the time they were made in light of all facts and circumstances. Strickland, 466 U.S. at 690; see Cooper, 849 S.W.2d at 746.

The Defendant first argues that his counsel failed to adequately investigate his case, including the "validity of the identification procedures used to identify the Defendant." During an in-chambers discussion prior to the start of the trial, the Defendant complained that King failed to file a motion, which he had requested, to suppress identifications made of him by the victims. After further discussion, during which King explained that he believed he and the Defendant had reached an agreement not to file the motion, the trial judge dismissed the matter, agreeing with King that the motion did not have merit. Evidently, the Defendant now argues that had his attorney adequately investigated his case, he would have determined that the pretrial identification procedures were suggestive and that they therefore irreparably tainted the identifications of the Defendant made in court by the victims.

Suggestive pretrial identification procedures are prohibited to avoid the "primary evil . . . [of] a very substantial likelihood of irreparable misidentification" of a defendant by a witness in court. Neil v. Biggers, 409 U.S. 188, 198 (1972) (citing Simmons v. United States, 390 U.S. 377, 384 (1968)).

> [T]he factors to be considered in evaluating the likelihood of misidentification include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the

-13-

accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.

Neil, 409 U.S. at 199-200. The central question is whether under a "totality of the circumstances," the identification was reliable, even though the procedure may have been suggestive. Id. at 199.

Although one-person showups have generally been criticized and condemned as being overly suggestive, we do not find that the showup conducted in this case irreparably tainted the victims' in-court identifications of the Defendant. Both victims unequivocally identified the Defendant as their assailant to police on the night of the crimes, even going so far as to name the street where he lived. Moreover, and perhaps most importantly, both victims testified that they had known the Defendant since childhood. Under these circumstances, we cannot agree that the showup conducted on the night of the crimes caused "a very substantial likelihood of irreparable misidentification" of the Defendant at trial. Simmons, 390 U.S. at 384. Thus, we find no error on the part of Mr. King in not "investigating" the matter further or in failing to file a motion to suppress the identifications.

The Defendant also contends that had King fully investigated his case, he would have discovered the testimony of Ms. Howell. Again, this is a matter that was addressed during the in-chambers discussion prior to the start of the trial. During the meeting, King stated on the record that Vicky Howell had been subpoenaed as a witness but failed to show up on the morning of trial. King stated that Howell had testified at the preliminary hearing that Charles Steele told her shortly after the crime he had cut his hand on a knife while cleaning a turtle.

-14-

King offered to seek a continuance of the case until such time as Howell could be procured as a witness, but the Defendant elected to proceed to trial without Howell's testimony. Moreover, Steele admitted at trial that he told Ms. Howell that he received his injury while cleaning a turtle. For these reasons, the Defendant's allegation that his counsel failed to "investigate" Ms. Howell's testimony is meritless. Furthermore, we find no other evidence that Mr. King failed to adequately investigate the Defendant's case.

We find that the Defendant's second and third claims of error are also without merit. Much of the Defendant's dissatisfaction with King's representation evidently stems from the fact that he claims to have hired Kent Brisby, a member of the firm in which King practiced. The Defendant complains that he was not made aware that King would be handling his trial until "during the date of the trial." He contends that King should have requested a continuance to further investigate the case, and he claims that King spent "absolutely NO time" with him to prepare for the case.

During the in-chambers discussion before trial, the trial judge entertained discussion concerning the adequacy of the Defendant's representation. King stated that he had discussed the case with Brisby and that Brisby believed King was in a better position to try the case. He also stated that he had spoken with the Defendant for two hours the night before the trial, during which time they had discussed the two motions requested by the Defendant. King maintained that he believed they were "clear on" the motions and ready "to go to war together." The Defendant did not deny the truth of these statements. Moreover, the Defendant admits in his brief that King was present during at least one meeting with Brisby

to discuss the case. During the in-chambers meeting, the Defendant agreed that he did not want to continue the case, despite King's suggestion that he be allowed to find other representation if necessary. The trial judge concluded that in his experience, King was a competent attorney and suggested that they move forward with the trial. In light of these discussions, we find the Defendant's second and third allegations of error to be meritless.

The Defendant next contends that his attorney's representation was inadequate because his counsel failed to object to an improper comment made by the trial judge, "the law does not apply in [this] court room [sic]," or request a change of venue following the comment. We have addressed the issue of judicial misconduct above and conclude that because we find no such improper comment in the record, Mr. King did not err by failing to request a change of venue.

The Defendant's fifth and sixth contentions of error concern the cross-examinations of the victims. Despite the Defendant's assertions to the contrary, King cross-examined both victims about their personal and criminal histories. We find no deficiency on the part of Mr. King with regard to the cross-examination of witnesses.

Finally, the Defendant argues that his counsel failed to reveal the fact that he received a "serious wound" to his hand which was caused by the victims on the night of the crimes. However, the Defendant made no mention of any such wound during his testimony, nor can we find any other reference to the wound in the record. Had the Defendant wished to reveal this fact, he could have done so

himself when he took the stand to present his version of the events on August 29, 1997.

Although we find no error on the part of Mr. King, we are convinced that any error which may have been made did not prejudice the Defendant. We cannot agree that had Mr. King proceeded differently, the jury would have had reasonable doubt regarding the Defendant's guilt. The Defendant points to no further evidence to support such a finding and has shown no prejudice resulting from the errors that he alleges King made. This issue is therefore without merit.

## VI. IMPROPER STATEMENTS DURING CLOSING ARGUMENTS

The Defendant argues that the prosecutor made improper and prejudicial remarks during his closing argument. However, the record does not contain a transcript of closing arguments. The appellant bears the burden of preparing a complete record on appeal. Tenn. R. App. P. 24(b). In addition, the Defendant failed to include this issue in his motion for new trial. Therefore, this issue has been waived. Tenn. R. App. P. 3(e); see State v. Clinton, 754 S.W.2d 100, 103 (Tenn. Crim. App. 1988).

## VII. JURY INSTRUCTION

The Defendant contends that the jury instruction on "reasonable doubt" was constitutionally infirm, and he also complains that the trial court failed to read the instructions aloud to the jury, merely handing them a copy instead. Again, the Defendant has failed to include this issue in his motion for new trial. Therefore,

this issue has been waived.  Tenn. R. App. P. 3(e); see State v. Clinton, 754 S.W.2d 100, 103 (Tenn. Crim. App. 1988).

## VIII.  ACCESS TO RECORD FOR APPEAL

The Defendant complains that he was denied access to trial transcripts and other records necessary to perfect his appeal.   As the State explains, "[a]pparently, the problem stems from Williamson County's policy of preparing video transcripts, which are deemed contraband at the facility where [the Defendant] is being housed."  In response, the State points out that the trial court not only granted the Defendant's motion for transcripts and records from the trial, but also appointed an attorney to assist the Defendant with his appeal.[6]  The State maintains that the attorney "could arguably [have] provide[d] assistance in viewing the videotapes from the trial in order to provide [the Defendant] with appropriate citations to the record."

A criminal defendant proceeding pro se on appeal, having been granted permission to do so by the trial court, certainly must not be denied access to the full record of his trial, regardless of the record's format. However, while we agree that a defendant must be allowed access to all records and transcripts, the Defendant in this case has not demonstrated prejudice resulting from having been denied an opportunity to personally view the videotape transcript of the trial. He has not specified what information he was denied.  Thus, in light of the appointment of counsel to aid the Defendant on appeal and the Defendant's

---

[6] The order granting the Defendant's motion for transcripts and records and appointing an attorney, which is dated one day after the technical record was filed with this Court, is not included in the technical record.  However, the Defendant has attached a copy of the order to his brief.

failure to show prejudice resulting from his inability to view the tapes, we conclude that this issue is without merit.

Accordingly, the judgment of the trial court is affirmed.

_____
DAVID H. WELLES, JUDGE

CONCUR:

_____
JOHN H. PEAY, JUDGE

_____
JAMES CURWOOD WITT, JR., JUDGE